We'll hear argument next in Appeal 2007-5067, American Savings Bank v. United States. Good afternoon. Welcome. Thank you, Your Honor. Please proceed. Thank you, Your Honor. May it please the Court. The trial court erred when it found liability and awarded $400 million in restitution and damages on summary judgment. Is that your strongest argument? No, Your Honor. That's just an introduction. I'm heading straight to my strongest argument. Well, actually, Your Honor, I believe all three arguments are strong, but I'll head directly to the breach argument, Your Honor. The trial court improperly found a breach of the assistance agreement, though the assistance agreement anticipated and addressed the possibility that the forbearance letters might change. The contract states that changes in the forbearance letters that affect income are a material change of law, and that's in A200-190. But they don't say that affect income. They say that affect tax. Is that right? Respectfully, no, Your Honor. It says that affects taxable income. So any change in the forbearance or change in law that affects taxable income is a material change in law. And as such, the assistance agreement expressly provides certain remedies, certain benefits and changes in benefits to affect that. But that provision doesn't say this is the only remedy that any breach will trigger. But, Your Honor, it— But you say it actually is the only remedy available under the agreement. So you must be saying that that remedy provision is intended and understood and has to be construed by us as being exclusive of all other remedies. Of all other remedies that are changes in law of this type. It would not be a remedy, for example, if the government had stopped paying interest on the FISLIP note or other types of breaches that might have occurred. But because it specifically addressed change in law, change in forbearance that affect income, that yes, it is the exclusive remedy, Your Honor. And that can be seen in the rights and powers section of this assistance agreement. It is not an open-ended preservation of rights. Instead, the only rights and powers and remedies that were preserved were those, quote, not inconsistent with provisions of the transactions-related documents. And that can be found in A200265. So they forewent some of their rights and the like under the statutes and law in order to get the benefits that they got in the material change of law provision, which specifically are that they can file a notice of material change and they can get a reduction in the amount of tax benefits they have to share with the government. That would be up to $300 million worth of benefits. In this case, what happened was the plaintiffs did, in fact, file a notice of material change, and that can be found in A21187. And in that, they said a material change has occurred, one of which is you have, quote, the purported elimination of capital accounting forbearances at A21192. So they identified that change of the forbearances as a material change in law. And because of that, they received $155 million reduction in the amount of tax benefits they had to share with the government. Can I move on to warrant forbearances unless my colleagues want to ask any more? Absolutely, Your Honor. OK. I'm a little clear. I mean, as I see this, the first, at least one argument is the divisibility question, right? And it's whether or not the court erred in saying that the contract was divisible. That is one argument under the restitution. That is part of the restitution. And he granted summary judgment. And the government's argument is that he shouldn't have granted summary judgment because there were genuine issues of material fact. There are two arguments, Your Honor. The first is that there's a presumption in Stone, Forrest, and Carroll, and Hunt. The short answer is yes, but we believe that this court could resolve it on the law as well. And the law because the agreement is absolutely clear, and just on the face of the agreement, there's no ambiguity, and therefore we could say that it wasn't divisible? Yes, Your Honor, because it understood— Well, doesn't that kind of undercut your argument with respect to the court? I mean, how can you have it both ways? On the one hand, either you're saying that this determination requires—raises a factual dispute because there's ambiguity in the agreement. On the other hand, there's no ambiguity of the agreement. Your Honor, the way we can sort of have it both ways is because Stone, Forrest, and Carroll, and Hunt established a presumption that it is not divisible. And thus, they would have to come in and establish that within the four corners of the contract, because that's what Stone, Forrest, and Carroll, and Hunt said, that it demonstrates it is divisible. So they can't—and the trial court didn't even look in the four corners of the contract. If you look—so because it's the four corners, this court can do that review itself. Then we believe that there's nothing indicating divisibility. The presumption prevails, and this court can reject the restitution. And you've asked us to then enter summary judgment for the government? To reject their argument, yes, Your Honor, based on the four corners of the document. If you get to what the trial court did, which was you look beyond the four corners of the document, you look to facts and indicia surrounding it, then we believe that, at a minimum, we're entitled to summary judgment because those are factual disputes. Wait. At a minimum—I'm sorry, ma'am. At a minimum, they weren't entitled to summary judgment. Precisely, Your Honor. So you want a trial? Is that the bottom line here? You want a trial on damages? Summary judgment won't do it. We need a full trial on damages. Your Honor, we believe that the award of restitution is reversible and should be denied as a matter of law. If the court rejects that— Well, what does that mean, that you get summary judgment of no damages to that extent of the final judgment? Yes, Your Honor, because the— So you're asking us to grant summary judgment to you in this appeal? Your Honor, what we're asking is to find that, as a matter of law, the legal theories that they've pursued for damages, for restitution and damages, don't support any possible award and to find for the government to reverse the award. But we could do that on several—I mean, what are your arguments in that regard? One, we could do that if, in your view, if the contract is—if we read the agreement and say on its face it's not divisible. Yes, Your Honor. We could do that if we agree with your argument that we're under Old Stone. There's no entitlement to restitution. Yes, Your Honor. We also— Am I missing anything? If the court finds no breach, then we stop right there. If the court agrees with our interpretation that— Oh, on the first question. Oh, on the first question, then— But we're on the word forbearances. Okay. Yes, Your Honor. But just to cover that, then we could stop there as well. The—sticking with the concept of restitution, Your Honor, obviously restitution is to unwind a contract. It's to unwind the agreement and to give—to put the parties back where they started the day before they entered into it. And that's a series of cases, Landmark, Hanson— Yeah, but on the—I don't want to rush you, but there's a lot to cover here. Absolutely. So in the restatement, it says it's sort of a pretty broad exception, which is a non-breaching party does not waive its right to restitution, where he continues to perform in order to preserve what he has already invested. Isn't that what happened here? Your Honor, as the Old Stone case explained, this is not a question of waiver. This is a question of the election of remedies. And no, that's not what happened here. The concept of restitution is that if—it only provides net loss. If you're losing—if the contract is a loser, for example, in Landmark, we seize the thrift. Then they can seek restitution and try to get back where they started. No, but what about the other prong, which is sort of the unjust enrichment of the breaching party? Even that, Your Honor, can't permit a windfall profit to the plaintiffs. In this case, they walked in with the door worth $350 million. With the restitution that the trial court gave, $346.5 million, that would be 99% unwinding. That would mean that the only thing left was 1%, but that 1% is the entire thrift. Unlike the closed thrift cases, we didn't get this thrift back. They kept it, and then they ultimately sold it for a billion dollars. I'm not sure I understand this argument. They took a losing thrift already in receivership, and they salvaged it, despite FIREA. And now, I'm not sure what you're trying to make of that. If they hadn't been able to salvage it, we understand the consequences for the government would have been enormous. But you're saying because they did salvage it and ultimately made a profit out of it, therefore it doesn't matter? Absolutely. You're saying it doesn't matter. No, I'm saying it absolutely matters. Whether the forbearances and so on were changed or what the consequences may or may not have been by the change of law. At that point, because it's successful, they elect to continue. They elect to continue on with the agreement. Restitution is not available, not no remedy. And if they hadn't continued, which would at least have mitigated – better than mitigate – but at least have mitigated the injury to the government, I think there are arguments on both sides, and we need to consider them. But I am concerned about what looks to me like a very one-sided argument that because in the end they made money, everything else needs to be decided against them. Not at all, Your Honor. Not at all. The idea in the law, and this is in a number of cases, is this. When one side breaches, the other side has a choice at that time. They can say, look, this is a good contract. We want it to continue. Keep up with it and sue for partial breach, which is lost profits and expectancy. Or they can say, look, the contract is a wash. It's wasted. It's gone. We're going to step away from it. We're going to say it's a material breach, total breach, and we're going to seek restitution. It's a very clear divide that the mobile court identified. That's why total breach is required for restitution. It's not that there's no restitution. But the restatement and many authorities say that the choice is life isn't always that simple. Your Honor – And that there are aspects. Again, I mentioned mitigation, which might have been of itself a reason to try and keep going, to see what happened. See what happened in the economy. See what happened to interest rates. And a plaintiff is fully entitled to try to mitigate, and that's if they choose to, as the plaintiffs did in Oldstone. The difference is – Yes, and since they tried to mitigate, they're not entitled to any recovery for the loss of the forbearances and the clear breaches of their contract. Your Honor, they absolutely could have pursued those in lost profits, and they did below, and then they forewent that. They chose not to pursue that here. They absolutely could have. We've had a range of plaintiffs continue with their contracts, mitigate, and then seek lost profits. What they can't do, as they said in Oldstone, is attempt to mitigate and succeed or fail, but make that choice. The plaintiffs in Oldstone attempted for three years, failed, and the court said, no, you've elected to go one way. And the reason is this, Your Honor. If you elect to go in one direction and you run up the meter and you create a lot more damages for the government, then it's not fair. It's a moral hazard if at the end of the day – That's not the case? What? Yes, Your Honor. That they didn't increase the potential damages by mitigating the injury? They didn't, Your Honor, but restitution, when you've taken that road, is not an appropriate remedy. Briefly – Let me just ask a follow-up to that. Let's assume hypothetically that we were to affirm the judge on the note forbearance question, which is worth any number of millions of dollars. Then wouldn't that – would your answer to Judge Newman be a little different? In other words, that that's based on the accrual of interest after the breach, and so the government is suffering some liability from their continued breach. Absolutely. I'm sorry. Failure to stop. Exactly. Exactly what happened in Oldstone, which is – I mean, we don't believe that that should be affirmed, but certainly that would be an example of the type of moral hazard that we're talking about. And I'm running into my rebuttal. All I would like to say – Can I ask a question? Don't worry about the yellow light. We'll protect your time. Thank you, Your Honor. Looking at three parts, we've got – on one side we've got the 30 percent stock, the warrant, the 30 percent of the stock. Yes, Your Honor. And on the other side of the equation, we've got the warrant forbearances and the deposit base, the deposit premium. I guess I'm wondering what are the three – what are these three factors, if there are only three, and what is each one worth in the government's view? Let me take a – if I may, just take a step back for just a second. This – the transaction was extremely complicated. It involved 31 documents. I think we've got that. Already. And so what the trial court said is there is a divisible wedge. And I just want to make sure I'm clear that what you're talking about, Your Honor, is just this divisible wedge that the trial court found. You disagree that it ought to be divided that way. We don't believe that it's divisible at all. Right. But if – I just want to identify what the trial court found in that wedge. In that wedge, the trial court put the forbearance letter – the warrant forbearance, the deposit base, which was $167 million. That's how the trial court valued it. The branch of deposits that were contributed by the government and the warrants that the plaintiffs contributed to the deal as part of the deal. So in that – what the court identified as this break-off piece, that's what the court said. So where's the equation? So the 30% stock was originally valued at $167 million. Yes, Your Honor. And what is each of the other – what were the factors on the other side of the equation? What the court did was it said, well, the warrants and the – and the court is not completely consistent. But it effectively said the warrants and the deposit base were equal – about the same at the time that they were contributed, which is $167 million. But the warrants grew – the value of them grew to the time when, in 1996, when the thrift was sold, they were worth $600 million. So we're going to make the government give the plaintiffs $600 million offset. So he valued those, which we believe it was incorrect. Not at the time of the deal, but at the time when the thrift was sold. He then valued the deposit base back at the time of the original transaction and gave us interest on that. And that's why you have – So is the deposit base and warrant forbearances – is that just the same thing? Is it one side of the – It shouldn't be, Your Honor. That's what the trial court found. But no, the deposit base is basically a collection of deposits that has a value to a bank because it's a very low – So is there an independent value associated – is there a different value associated with the deposit base and the warrant forbearances? No one ever valued the warrant forbearance, Your Honor. It's – no one ever said, okay, the warrant forbearance has this value. There's no document that says that. We believe that it doesn't have a value, but because – or if it does have a value, it's not in the slice because the deposit base and the warrants were actually of equal value. And so there's no place in that. So your view is the value of the warrant forbearance is offset by other stuff in the agreement? To the extent it had value, yes, Your Honor. It's an enormous deal, and it was offset by the other things in that deal. All right. Let's hear from Mr. Yalowitz. Thank you, Your Honor. Mr. Yalowitz, when this lawsuit started out, as I recall from the complaint, it charged in shepherd counts a breach of contract and Fifth Amendment taking. That's correct, Your Honor. Well, whatever happened to the taking claim? The takings claim became moot by the time the judge decided the contract claim, awarded summary judgment on damages. The plaintiffs said, let's be done with the case. We've got $400 million in damages, and we'll consent to entry of judgment on that claim as a final judgment. Well, I'm not sure I understand what you're saying. The judge never decided to say. If the takings claim wasn't withdrawn by you and wasn't rejected on some legal basis by the trial judge, then it would appear to still be hanging out there unadjudicated. It would if we hadn't consented to final judgment. I think that claim is merged into the final judgment. So if this court affirms the final judgment. The final judgment doesn't say anything about the takings claim is now moot or it's dismissed or it's conceded to be no longer part of this case or any such thing. It just gives judgment on the breach claim. I may be misremembering, Your Honor, but I believe that the plaintiffs stipulated to the entry of final judgment on all claims on the basis of the trial judge's damages decision. If I'm incorrect in that, I will send the court a letter confirming what the procedural posture was. All right. Then on the merits. Okay. May it please the court. Regulatory capital is the lifeblood of a bank. In this case, the plaintiffs promised to provide 70% of the regulatory capital in exchange for 70% ownership. The FISLIC promised to provide 30% of the regulatory capital in exchange for a warrant worth 30% of the bank. $350 million from the plaintiffs in cash, $167 million from the FISLIC in the form of the deposit-based intangible as regulatory capital. And you say you're entitled to restitution in this case? Partial restitution.  Correct, Your Honor. And you rely on First Nation wide and not Old Stone. Correct. But even in First Nation wide, they do say that so long as the plaintiff waives any other damages following from the breach, there can be partial restitution. If we were to affirm the court of claims on the note forbearances, then you haven't waived other damages flowing from the breach. You're asserting other damages. Is that an offer, Your Honor? No. No, not at all. I mean, you haven't waived any other damages. You haven't waived them whether we affirm it or not. You haven't waived it. So how are you—I mean, I think there might be other reasons to distinguish you from First Nation wide, but how can you— tax benefits lost was smaller—was larger, substantially larger than the amount of partial restitution that he was awarded. So that—and he said, so that since they're not seeking other damages as a consequence of this divisible breach, then I don't have a problem with windfall. That was my reading of his opinion, which doesn't show up in this court's opinion in First Nation wide, but I do take the point. Here we have two breaches rather than the one breach that we had in Nation wide. Here we have the warrant breach and the note breach. The warrant forbearance breach is, in our judgment, in the judgment of the trial court, meaningfully divisible on the basis of First Nation wide because the parties intended in this contract that if there were a material breach, the parties were going to have to continue to perform, and in continuing to perform, seek damages that were commensurate with whatever loss there might be. In this case, FIREA abrogated and invalidated the contribution of the warrant capital, made that contribution as capital impossible. And the consequence was that the party that contributed, that had promised to contribute the capital, lost its right to the ownership position that it had received in exchange. But you suffered—I mean, you're not asking for damages that are commensurate in any way, shape, or form with your loss. What you're seeking is restitution. What you're saying is that the government made a profit and we ought to get it rather than the government keeping it. That's right. It's a disgorgement of a gain to which the government was not entitled. Washington Mutual paid $650 million— So there was no loss here. There was no loss suffered. The loss was that the plaintiffs were entitled to the entire entrepreneurial reward, having made the entire entrepreneurial contribution. And the government, by virtue of its ability to grasp the warrant, received 30% of the entrepreneurial reward, even though it wasn't entitled to that money because it had not made the entrepreneurial contribution. Wait. So your view is, though, there's a one-to-one correlation. You gave 30% of the stock for what? Just the regulatory capital? For regulatory capital. That's right. That's right. And so the plaintiffs were perfectly happy— And so when they breached, why didn't you go in and say, we want our stock back? They did. They did. But the FDIC was the regulators, and the regulators said, we're not going to give it back. And there's a lengthy back and forth of efforts in the Patalunis memo, the memorandum of Gail Patalunis reciting all of the times that the parties attempted to resolve the issue of the ownership. But you never filed suit. Filed suit three years later. Three years later. Right. Isn't there a factual dispute as to what in fact was a concerted effort by the parties or whether or not there was a concerted effort by the parties to try to do this? I don't think so, and I don't think it's material. You know, in Old Stone, the issue was not that you have to run into court right away. The issue was that the plaintiffs had—the capital of the bank had gone essentially to zero, and the plaintiffs were in effect gambling with the house money. Here it's the opposite. Here, the capital contribution that the FISLIC had promised made the bank—would have made the bank a much bigger bank, but somewhat riskier bank. By withdrawing the $167 million in warrant capital, the FISLIC essentially made the bank a very low-risk bank. Smaller, lower risk. Less risk to the deposit insurer. And then they said, even though we didn't take the risk, if the bank succeeds, we're going to get the upside. So the moral hazard is actually reversed in this case as compared to a case like Old Stone. So in First Nation law, the critical issue for the court—there were two critical issues, it seems to me. The first is whether the parties intended that the contract would be meaningfully divisible. And by that, what I mean is that the party who is the victim of the breach has a right to continue performance and to seek a remedy for the non-breached—to continue with the non-breached portion of the contract and to seek a remedy for the breached portion. Where do we find that? To me, that is the—the concept is articulated very well in Stone Force. No, no, no. Where in this agreement do we find the expression of the intent that you said these parties both had when they signed this agreement? There are three places, Your Honor. First, Section 26 of the agreement. Section 26 is on page 200, 267 of the record. It says, if any provision of the agreement is invalid or unenforceable—in this case, the warrant capital was invalidated— then the agreement shall, to the extent possible, be reformed to carry out its entire purpose and intent, including, without limitation, the purpose and intent of the invalid provision. And the agreement, as so reformed, shall remain in full force and effect. In other words, the victim of the breach does not have the right, because of invalidity of a provision, to terminate the contract. The victim of the breach has to soldier on. Second provision in the contract, Section 28, on page 200, 272 of the contract—of the JA. Section 28 says, in relevant part, any liability forfeiture, which is what we have here, or other remedy for breach, default, or failure by any party to perform or comply in any material respect with any of its obligations here under, or any other agreement or understanding referenced herein, shall correspond to the magnitude of the economic loss thereby caused to the other party. Again, the option to terminate the contract— How do we know? Why does that instruct us that the contract was divisible? I'm not clear why that provision tells us anything. What it teaches us is that the parties did not have the option to terminate this contract in the event of a material breach. It was simply not an option for the plaintiffs to show up at the FDIC after the breach and say, you breached, contract over, here's your bank back, and by the way, it's going to cost you $3 billion to liquidate, and good luck to you. They didn't have that option under this contract. And that's what this court said in First Nation, which was also an acquisition of an insolvent thrift from FISLA. And in First Nation, the court said, a non-breaching party is not required to create an even worse situation by abandoning all performance in order to preserve access to remedy. So the idea that somehow these plaintiffs elected not to be able to seek a partial restitution remedy is belied by the contract terms and by the circumstances that this court found compelling in First Nation, which was essentially an identical contract. It was a different breach, but it was the same kind of contract. Did you give us the third? The third is the absence of any mechanism to hand over the keys of a bank to the FDIC. There's no way to do it except to allow the bank to become insolvent, which makes a bad situation worse. So it's two provisions of the contract and the absence of a mechanism for returning the bank and terminating the contract. Once we decide that the plaintiffs have the ability to seek the partial restitution remedy, it seems very clear that the negotiating history, which is what this court looked to in First Nation wide, demonstrates a meaningfully divisible paired exchange. And what I'd like to read, and I'm sorry to read so much, but this is so powerful, and this is a proposed finding of uncontroverted fact submitted by the defendant to the trial court. These are the defendant's word, not the plaintiff's. They said, as part of this transaction, plaintiffs and the FISLIC both agreed to contribute capital to the resulting institution. The FISLIC's contribution came in the form of the Old American. Well, actually, if I can interrupt, that's in your brief in its entirety. Yes, it is. Okay, let me move on then before your time runs out to just another question, which is you're referring now to documents in the negotiation history. Yes. And didn't the court of claims tell us that we shouldn't be considering anything other than the final agreement? There's a difference between asking, as the defendant did on liability, to vary the terms of an unambiguous integrated contract with parole evidence, which we're not supposed to do, and then saying, okay, we've now determined what the promise is, we've now determined that the promise has been breached, and so now let's decide on a remedy, and what do we look to to the remedy? And there all of the circumstances come in, as in any other cases, in a lost profits case or any other kind of contract case. So the parole evidence rule applies to the promise, but once you get to damages and remedy, the court is free to look at all of the evidence. In fact, there was massive, extensive discovery and evidence in the trial court. I think that I don't need more time unless the court has questions about the things that I didn't cover. Thank you. Okay, thank you. Mr. Dinter? I'll give you back the five minutes you had hoped to reserve. Thank you, Your Honor. Your Honor, I'd like to start with the three elements my colleague at the bar mentioned, that they say supports their divisibility argument. First of all, he identified nothing in the contract that creates this wedge of these three items in it. He didn't refer to anything that can demonstrate the actual divisibility of which items go in this bucket and which items don't, even if it was divisible. Second, the items that he listed, the first one is in the entire agreement clause. It doesn't indicate divisibility. All it says is that there's no waiver. And Oldstone says that the selection of remedies is not a waiver. He turns next to the successors in the signs clause and says that they didn't have a choice of walking away. Basic contract law says that they do, that if there's a breach, you can say there's a total breach of walking away. And if this, in fact, took the—if they contracted away this right to do that, then they gave that up as part of the contract. And in doing so, they said that they would—I mean, basically said that they wouldn't pursue restitution because they weren't going to walk away. The third thing that he said was that there's no way to give back a threat. Well, certainly there is. You tell the regulators that you don't want to run it anymore, and it becomes the regulators. That, in fact, happened in a number of FIREA cases. So neither of those can support the idea that this is a divisible contract and, if so, where that dividing line should be. I— Are you arguing, in effect, that there's no such a thing as partial restitution, which is the other side's argument, that there's only total restitution in the face of a total breach, and that didn't happen here? End of story. Your Honor, yes. But we don't need that to win. But, yes, Mobile Oil says you need total breach for restitution, and total breach would inherently mean— Well, just not to play with words, but if the request is for partial restitution, then why doesn't partial breach support that? The idea is, Your Honor, that it gives you the best of both worlds. You can keep playing with the government's money, as Oldstone said, and if you lose, you can give part of it back. And if you win, you get to keep it. The idea is at the time— I'm just trying to understand where the argument or the claim is for partial restitution, whether it is true, as you seem to be arguing, that the predicate is total breach. Which didn't happen here. It didn't happen. And so the question—the real question, Your Honor, is whether partial breach can support a claim for partial restitution. And if it does, Your Honor— And you're saying no, which makes me suspect that you're saying total breach is required. Yes, Your Honor, as Mobile says. Even for partial restitution, total breach is needed in order to support partial restitution in your view. In our view, Your Honor, there is no partial restitution. As the Oldstone court said, what happened— So the doctrine doesn't exist, or it can't apply here, or what? Yes, Your Honor. Well, which? Both, Your Honor. It doesn't exist, and if it did, it wouldn't apply here because here it was not a divisible concord. If it does exist— Didn't Nationwide have partial restitution? Well, in Oldstone, Your Honor, the court said that no, actually they didn't. It wasn't because—the plaintiffs in First Nationwide didn't put something in and try to get it back. They were actually trying to compel performance, and that really isn't restitution. Also, what the court said in First Nationwide is that if there was partial restitution, the plaintiffs preserved their position by filing immediately. Now, the plaintiffs in Oldstone didn't. They tarried too long, and it was found that they tarried so long it wasn't available. The plaintiffs here waited three months longer than the plaintiffs in Oldstone just to file their suit. So if the plaintiffs in Oldstone waited too long, these plaintiffs waited far too long. Next, Your Honor, the— I would like to get back for just a moment to the breach issue, Your Honor. The plaintiffs recovered $155 million on their notice of material change, part of which was predicated, as they said, undisputed, on the change in the forbearance. They have recovered based upon that. In the settlement agreement, wherein they recover, it states that all claims that are raised in the notice of material change are completely resolved. That's—they signed that agreement. That can be found at 200-656. So there's no question that—I mean, we're not talking that there's this hypothetical remedy and maybe they could have invoked it. There was a remedy. They did invoke it. They got a substantial amount of money, and that should have resolved the case. Why? Why? Because, Your Honor, the alternative is to imagine a contract where the parties said, look, we'll put in a remedy where you can get up to $300 million, and then you can also sue us. And we'll just ignore the fact that you got that $300 million, and we'll let you sue us and basically recover all over again. I mean unless you can imagine a contract— I didn't understand anywhere in your briefs that you argued that there was a double recovery here. Your Honor, it's the same as the windfall argument. If they recovered—there's no question that they recovered under the settlement. I mean it's undisputed, and it states it in the settlement. There's no question that the settlement was in part applied to the material change notice, which one of the issues raised is the forbearance cancellation. $150 million to $5 million was paid on that. So any money that they recover here is above and beyond what they've already secured under the agreement and adds to the amount of money that they've made on this transaction. The idea of restitution is put them back the way that they started. And this goes, Your Honor, to the idea of partial restitution and why if it did apply, it doesn't apply here. Put them back. The day they started, $350 million in their pocket. Right now, they've already made a billion dollars, which is fine. They deserved it. They earned it. They've made a billion dollars on this deal. If the court gives them $400 million of the taxpayer money, it's not putting them back on that date of $350 million. It's putting them in a position of $1.4 billion. That's not restitution. It's not any type of damage. But the total picture doesn't consist of what capital they put on the table at the start of this series of events. They volunteered through these inducements to shield the government from potentially catastrophic liability amounts. And in doing that, took huge risks, I think it's fair to say, themselves. And did so as a part of a very complicated arrangement where they had to do a number of things and the government had to do a number of things. And in the end, some of the government's obligations were discharged. Others were not. So it's not clear to me why you feel compelled to say that any further recovery is just a windfall. Because in their starting out position, they're not only taking risks, there's an upside if things go well. So to say, well, in the beginning they only contributed $300 million, and if they ever get anything more than that, it's all just a windfall doesn't quite make sense to me. Finally, Your Honor, there's three brief things to address in that. The first is the government put in $5.8 billion in assistance, and we continue to take the risk. Somebody held a gun in your head. That was the judgment of FISLIC that that's how much they needed to put in to incentivize these investors to do what you wanted them to do. We don't begrudge them that, Your Honor, and we don't begrudge them the money, the billion dollars. If restitution is going backwards, if they thought that they were harmed and they wanted to prove lost profits, they chose not to. Then we could have the discussion about making more money on top of it, but the idea of restitution is to go back. That's the concept of restitution. Lost profits is, okay, they made a billion. Do they deserve more? Okay, let's put some more on top of it. But they didn't pursue lost profits, so that's not the discussion that we should have. We should have the discussion, okay, restitution, let's look at the day before they did the deal. I mean, there are – they are very distinct remedies. Finally, on the issue of disgorgement, Your Honor, the plaintiffs are only allowed to get back to the point where they started in restitution. Any more than that is punitive and it punishes the government. There's not a waiver of sovereign immunity to allow the plaintiffs in restitution to come back better than they were, and that's where it would amount to. All right. We thank you both. We'll take the appeal under advisement. Thank you, Your Honor.